### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| Amber Ferrell, individually and on behalf of all others similarly situated, | |
| Plaintiff | Case No. 6:25-cv-00330-JAR |
| v. | |
| Orthotech, LLC | Jury Trial Demanded |
| Defendants. | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### INTRODUCTION

A constitutional provision adopted in the eighteenth century, the Fourth Amendment, applies to thermal imaging technology, even though thermal imaging did not exist when the Fourth Amendment was ratified. *Kyllo v. United States*, 533 U.S. 27, 34–36 (2001). So too here. The Telephone Consumer Protection Act's prohibition on unwanted telephone solicitations is not limited to the communications technology that was common in 1991. When Congress enacted the TCPA in 1991, the ordinary meaning of a telephone call was communicating—or attempting to communicate—with another person via telephone. A text message is exactly that: it is a communication, or attempted communication, transmitted through a telephone. Defendant's reading treats the TCPA as if it were enacted in 2025 instead of 1991. In 2025, it may feel natural to read the phrase "telephone call" as excluding text messages because modern usage draws a sharp distinction between "calling" and "texting." But that contradistinction is a product of later technological development. It was not part of ordinary language when Congress enacted the TCPA. For that reason, the TCPA has always covered text messages as a matter of statutory text and

original public meaning, independent of any deference to the Federal Communications Commission. The FCC's interpretation does not expand the statute; it confirms what the statute already means. The TCPA authorizes the FCC to establish by regulation "a list of telephone numbers of residential subscribers who object to receiving telephone solicitations," 47 U.S.C. § 227(c)(3), and to prohibit telemarketers from "making or transmitting a telephone solicitation" to numbers on that list, § 227(c)(3)(F). Those protections are not limited to a particular generation of technology. For decades, the FCC has applied the Do Not Call rules to residential subscribers regardless of whether their numbers are associated with traditional landlines or cellular phones. *See* 47 C.F.R. § 64.1200(c)(2), (e). The FCC has likewise made clear that the Do Not Call rules apply to text message solicitations, not just voice calls. *See* 47 C.F.R. § 64.1200(e). Defendant's contrary interpretation would create an artificial loophole that does violence to the text rather than respecting it.

Defendant's arguments concerning the Oklahoma Telephone Solicitation Act fail for the same reason its TCPA arguments fail: they depend on rewriting the statute to add requirements the Legislature did not impose. The OTSA authorizes suit by any party "aggrieved" by a violation and permits recovery of "actual damages or Five Hundred Dollars ($500) whichever is greater." 15 O.S. § 775C.6(A). Defendant's motion effectively reads the statutory damages option out of the statute by treating "actual damages" as a required element of the claim. That is not what the text says. But, in any event, Plaintiff has pleaded actual damages even though she does not have to.

ARGUMENT

## I.    The text of §227(c) covers text messages.

The TCPA authorizes recipients of unwanted "telephone solicitations" to sue for violations of the FCC's Do Not Call List rules. 47 U.S.C. § 227(c)(5). In relevant part, that private right of

action says anyone may sue who "has received more than one telephone call within any 12-month period … in violation of the regulations." *Id.*

The Do Not Call List provisions authorize the FCC to regulate "telephone solicitations," a defined term that plainly includes text messages. *See* 47 U.S.C. § 227(a)(4), (c)(1), (c)(3)(F). And the private right of action has the same scope as those other provisions.

### a. The Ordinary Meaning of "Telephone Call" in 1991 Encompasses Text Messages

The core of § 227(c) is its prohibition on sending "telephone solicitations" to numbers on the Do Not Call List. 47 U.S.C. § 227(c)(1), (3)(F). The statute defines a "telephone solicitation" in relevant part to mean "the initiation of a telephone call or message … which is transmitted to any person." 47 U.S.C. § 227(a)(4). Although the statute uses the term "call," courts—including the Supreme Court—have made clear that text messages qualify as calls under the TCPA. Courts within the Tenth Circuit apply that same rule. See *Robison v. 7PN, LLC*, 569 F. Supp. 3d 1175, 1181–82 (D. Utah 2021) (recognizing that "[t]ext messages are considered calls in the TCPA" and analyzing plaintiff's § 227(b) claim on that basis).

That definition encompasses modern text messages. As further explained below, the word "call" in the TCPA encompasses text messages. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) ("[W]e hold that a text message is a 'call' within the meaning of the TCPA."). That interpretation follows from "the ordinary, contemporary, and common meaning of the verb 'to call.'" *Satterfield*, 569 F.3d at 953–54 & n.3. The Ninth Circuit recently reaffirmed that conclusion after *Loper Bright*, holding under de novo review that "a 'text message' constitutes a 'call' within the meaning of the TCPA." *Howard v. Republican Nat'l Comm.*, 2026 U.S. App. LEXIS 787, at *10–11 (9th Cir. 2026). As the court explained, "Text messaging plainly fits within [the] literal definition of a 'call,' because 'text messaging is a form of communication used primarily between telephones.'" *Id.* at *11–12. And even if the word "call" weren't enough,

contemporary dictionary definitions of the word "message" emphasized that it encompassed "[a]ny notice, word, or communication, no matter the mode and no matter how sent." *Message*, *Black's Law Dictionary* (6th ed. 1990).[1]

Further, Webster's Basic English Dictionary defines call as, among other things, "to get in touch with by telephone" *Webster's Basic English Dictionary* 70 (Merriam-Webster, Inc. 1990). Webster's College Dictionary defines call as "to communicate or try to communicate with someone by telephone" *Webster's College Dictionary 194 (Random House, Inc. 1991).*  When a person texts another they are trying to communicate by telephone. Accordingly, based on the TCPA's original public meaning a "telephone call" is an attempt to "get in touch" by telephone; thus understood the term is capacious enough to include text messages or even morse code as long as these various means of communication are effectuated telephonically.

The Court in *Alvarez v. Fiesta Nissan, Inc*., 2026 U.S. Dist. LEXIS 14155, *8-11 (S.D. Tex. January 26, 2026) provided an in depth explanation of this analysis a few weeks ago while denying this same motion to dismiss:

> In today's regular parlance, of course, no ordinary person would use the word "telephone call" to refer to a text message. *Davis v. CVS Pharmacy, Inc.*, 797 F. Supp. 3d 1270, 1273 (N.D. Fla. 2025) ("No ordinary user of the English language would write the sentence 'John called Sue' intending to mean "John sent a text message to Sue'.") But this Court is cognizant that a usage which seems obvious *now* is not always a reflection of the *original* meaning of the statute. The use of the verb "to text"—now ubiquitous—had no such meaning in 1991. However, that does not mean it could not have been encompassed by the meaning of "telephone call." Indeed, the term "text message" only seems distinct from the idea of a "telephone call" today because the former term developed in our language specifically to distinguish a text communication from a voice communication

---

[1] *See also, e.g.*, *Message*, Webster's New Collegiate Dictionary (9th ed. 1991) ("a communication in writing, in speech, by signals"); *Message*, Oxford English Dictionary (2d ed. 1989) ("an oral or written communication sent from one person to another").

> These later developments have no bearing on our analysis, as "every statute's meaning is fixed at the time of enactment." *Loper Bright*, S.Ct. 2244 at 2266 (quotation omitted). And that meaning can be broad. Indeed, "[i]n their full context, words mean what they conveyed to reasonable people at the time they were written—with the understanding that general terms may embrace later technological innovations." *United States v. Palomares*, 52 F.4th 640, 648 (5th Cir. 2022) (Oldham, J., concurring) (quoting A. Scalia & B. Garner, Reading Law 16 (2012)). For that reason, "a 2012 statute referring to aircraft, if still in effect in 2112, would embrace whatever inventions the label fairly embraces, even inventions that could not have been dreamed of in 2012." Scalia & Garner, *supra*, at 16.
>
> The question, then, is whether the concept of a "text message" [*10] is fairly embraced by the meaning of "telephone call" in 1991. Looking to a dictionary contemporaneous with the TCPA's passage, the relevant definition of "call" was "to get or try to get into communication by telephone." Webster'S Ninth New Collegiate Dictionary 197 (1990). This language is capacious. Thus, a plain-language reading suggests that to send a text message is to "try to get or to get into communication by telephone."

This Court should hold the same. The meaning of "telephone call" is fixed as of 1991; what changes over time is the technology through which telephonic communication occurs. Defendant's reliance on modern usage confuses linguistic evolution with statutory meaning. The Supreme Court has made clear that general terms may embrace later technological innovations, even if those innovations were not specifically contemplated at the time of enactment.

The Defendant's argument to the contrary is rooted in modern parlance, but that's not how statutory interpretation works. *Kyllo v. United States*, 533 U.S. 27 (2001) is instructive here. There the Supreme Court considered the question of whether the police had "searched" a home when they scanned it using a thermal imaging device. *Id. at 29-30.* The thermal imaging scan was accomplished at a distance and did not provide information equivalent to being physically present in the home. *Id.* Nonetheless, the Court concluded that such thermal imaging was a search under the Fourth Amendment because to hold otherwise would not assure "that degree of privacy against government that existed when the Fourth Amendment was adopted" (*id*. at 34) and "would leave the homeowner at the mercy of advancing technology" (*id.* at 36).

Defendant's argument is essentially the same argument the state made—and the Supreme Court rejected—in *Kyllo* that a law should not regulate technology that did not exist when it was enacted. Defendant makes the same move here:

> [The drafters] could not have meant for ["search"] to include ["thermal imaging,"] for the simple reason that [thermal imaging] "did not exist in [1789] when the [Constitution] was enacted." The meaning of a ["search"] has not mysteriously changed in the last [230] years … But whether in [1789], or 2025, [thermal imaging] is not a ["search"].

ECF 22 at 8 (alterations made to drive home the point). Statutes, including the TCPA, can (and should) regulate technologies that did not exist at the time of enactment because statutory language can reach applications that the drafters did not intend or anticipate. *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) (rejecting the argument that Title VII could not apply because "few in 1964 would have expected Title VII to apply to discrimination against homosexual and transgender persons").

Indeed, the *Alvarez* case addressed this in the context of another evolving law interpreted by Courts:

> the Court finds there is nothing in [*11] the meaning of "telephone" that excludes the function of a text message. Remarkably relevant here is the classic case of *In re Erickson*, 815 F.2d 1090 (7th Cir. 1987). In that case, Judge Easterbrook considered a Wisconsin statute that made certain farming property unavailable to satisfy a civil judgment, allowing a farmer to retain "one mower" and "one hay loader." *Id.* at 1091-92. Just one problem: since the law's passage in 1935, farm technology had changed considerably. Old horse-drawn "mowers" were replaced by hydraulic, tractor-mounted haybines with hay conditioners, and "hay loaders" were replaced by automatic bailing/tying machines. *Id.* at 1092-93. And yet, the court found that the new technology was embraced by the old terms. Specifically, Judge Easterbrook wrote that a "'mower' is not limited to the thing called a mower today," because "[a] statutory word of description does not designate a particular item (e.g., "a Massey-Ferguson Mower, Model GY—2589, manufactured in 1935, serial number 3875808") but a *class of things* that share some important feature." *Id.* at 1092 (emphasis added). Indeed, "a mower with a built-in stereo cassette deck would still be a 'mower', . . . because it would still cut the hay," yet with "a second function, entertainment, just as [*12] the haybine has a second function, crushing the hay." *Id.* at 1093.

The Court finds this reasoning persuasive here. Defendant seems to define "telephone call" as "a call from a telephone as existed in 1991"—that is, *only* able to communicate by voice. But if "telephone" was as absolutely defined by its sound-transmission ability as required by that reading, it would prevent an otherwise unlawful voice call using a telephone with *any* modern features from falling under the statute. Thus, voice calls from almost every modern telephone—most of which can text, among many other capabilities—would not qualify as a "telephone call" under § 227(c)(5). "[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212, 118 S. Ct. 1952, 141 L. Ed. 2d 215 (1998) (quotation omitted). Just as a mower that both cuts and conditions hay is still a mower, a telephone which communicates texts and voice is still a telephone. And just as an aircraft built a hundred years from now such that it "could not have been dreamed today" can be embraced by 2012 statute regulating aircraft, so can a call from a telephone built in 2025—or 2125 for that matter—be embraced by a 1991 statute. Scalia & Garner, *supra*, at 16. Later [*13] meaning ascribed to words like "text message" cannot affect the Courts analysis of the original meaning of the phrase; in fact, considering the broad original meaning of "call" in 1991, society reasonably might have decided to refer to all telephone communications as "calls." That society does not today has no bearing here.

This reading is bolstered by the technology's history. First, it is known that cellphones and text-messaging services displaced pagers (or "beepers") as everyday technology.6 That was largely because pagers and cellphones served many of the same uses. *See* Jeffrey Selingo, *The Bell Is Tolling For the Beeper*, N.Y. TIMES, April 11, 2002, at G4 ("[M]any . . . are buying two-way pagers like the BlackBerry, which allow them to answer a message without searching for a phone."). By 1990, pagers could display alphanumeric messages, which were sent by *calling* the pager from a telephone. *See Radio Pager With Display*, N.Y. TIMES, July 6, 1981, at D3; Calvin Sims, *Checking Your Watch For Messages, Too*, N.Y. TIMES, Nov. 8, 1989, at D9. Although Plaintiff likely received the text messages at issue via a modern cellphone data messaging service, in 1991 he might very well have received messages to his pager, sent via telephone calls. If the latter is covered by the statute, why not the former?

At bottom, it is true that a telephone in 1991 was an instrument "for producing sounds at a distance." So is a telephone today. But that instrument may also send messages via "calls." Thus, to make a "telephone call," for purposes of § 227(c)(5), is to "to get or try to get into communication" with an "instrument for producing sounds at a distance." A text message therefore falls reasonably within the literal language of the statute.

*Alvarez* at *11-14. In short, Defendant's argument asks this Court to do precisely what the Supreme Court has repeatedly refused to do: narrow a broadly worded statute simply because technology has advanced. The TCPA's meaning is fixed as of 1991. What evolves is the method of communication, not the statutory language regulating it. Just as thermal imaging did not escape the Fourth Amendment, and just as a modern haybine remains a "mower," a text message transmitted through a telephone network remains a telephonic communication within the statute's reach. The statute's breadth is not a flaw—it is the product of the general terms Congress chose. Defendant's effort to carve out text messages based on later-developed vocabulary should be rejected.

In sum, nothing in the statutory text limits "telephone call" to voice-only communication frozen in 1991 hardware. Congress used general, technology-neutral language describing a class of telephonic communications, not a specific device configuration or transmission format. As the Supreme Court has repeatedly explained, the application of statutory language to later-developed technology reflects breadth, not ambiguity. Because a text message is an attempt to get into communication by telephone, it falls within the statute's ordinary meaning. Defendant's contrary interpretation should be rejected.

### b. Section 227(c)(5)'s Private Right of Action Applies to Text Messages.

Section 227(c)(5) grants a private right of action to enforce the Do Not Call List regulations to any "person who has received more than one telephone call within any 12-month period … in violation of the regulations." 47 U.S.C. § 227(c)(5). That is "a straightforward provision designed to achieve a straightforward result"—to enable "each person to protect his own personal rights" under § 227(c). *Krakauer v. Dish Network,LLC*, 925 F.3d 643, 650 (4th Cir. 2019). Accordingly, the FCC has recognized since 2003 that when the TCPA says "call," it means not just traditional

voice calls but also modern text messages. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 18 FCC Rcd. 14014, 14115 ¶ 165 (July 3, 2003). And many courts have reached the same conclusion. *See, e.g.*, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."); *Satterfield*, 569 F.3d at 954 (holding "that a text message is a 'call' within the TCPA"); *Dawson v. Porch.com*, 2024 WL 4765159, at *4 (W.D. Wash. 2024) (collecting cases).

The Court in *Wilson v. Better Mortg. Corp.,* 2025 U.S. Dist. LEXIS 251694 (S.D. NY.) held:

> District court decisions have largely held that § 227(c) applies to text messages. *See, e.g.*, *Mujahid*, 2025 WL 3140725, at *3; *MEDVIDI*, 2025 WL 2856295, at *2–4; *Skopos Fin.*, 2025 WL 2029274, at *4–5; *Hudson*, 2024 WL 4190513, at *8; *Pariseau*, 619 F. Supp. 3d at 1207; *Sagar v. Kelly Auto. Grp., Inc.*, No. 21 Civ. 10540, 2021 WL 5567408, at *4–5 (D. Mass. Nov. 29, 2021); *see also Bosley v. A Bradley Hosp. LLC*, No. 25 Civ. 22336, 2025 WL 2686984, at *5 (S.D. Fla. Sept. 19, 2025) (no dispute that § 227(c) applies to text messages); *Evers v. CampaignSidekick, LLC*, 2025 WL 2896818, at *4 (N.D. Ill. Oct. 10, 2025) (same); *Connor v. Servicequick Inc.*, No. 24 Civ. 2286, 2025 WL 2855393, at *2 (D. Colo. Oct. 8, 2025) (same). These decisions turned on statutory construction, not agency deference, and thus are not called into question by *Loper Bright*.

More recently, the Northern District of West Virginia held—after considering *Loper Bright* and *McLaughlin*—that "a text message is a call within the ambit of the TCPA" for purposes of § 227(c). *Mey v. Liberty Home Guard, LLC*, 2026 U.S. Dist. LEXIS 739, at *20 (N.D. W. Va. Jan. 5, 2026).

Orthotech relies on *Jones v. Blackstone Medical Services, LLC*, 2025 WL 2042764 (C.D. Ill. 2025) and *Davis v. CVS Pharmacy, Inc.*, 2025 WL 2491195 (N.D. Fla. 2025), both courts found it impossible to read "call" in anything but the familiar colloquial sense, and so concluded that the "analysis begins and ends there." *Davis* 2025 WL 2491195, at *1.

But *Jones* and *Davis* are unpersuasive. There, the court decided that a text message could not be a "call" for purposes of § 227(c)(5)'s private right of action because "[t]ext messaging was

not an available technology in 1991," and "in today's American parlance, 'telephone call' means something entirely different from 'text message.'" *Id.* at *4. But that is not the right way to interpret a statute. As the Supreme Court has cautioned—"modern intuition" doesn't always match "evidence of [a] term's meaning at the time of [a statute]'s adoption." *New Prime Inc.*, 586 U.S. at 114. When there's a mismatch, the original meaning of the text is what controls, not present-day usage. *See id.* at 114–16. So using the word "call" when one means "text" of course does sound odd to 2025 ears; unlike, say, the word "emoji," that meaning of the word "call" hasn't come to be part of the modern text messaging lexicon. But *Jones* and other cases go astray when they reflexively apply those present-day intuitions about how text messages are discussed to language from 1991, before the first text message was ever sent.[2] Courts addressing Jones and Davis have recognized that those decisions represent a minority view. As the court explained in *Mey*, although some courts have concluded that text messages are not actionable under § 227(c), "a greater number of federal courts have come to the opposite conclusion since *Loper Bright*." 2026 U.S. Dist. LEXIS 739, at *20. Most recently, the Northern District of Illinois rejected Jones outright, holding that "the Court declines to hold that the TCPA does not apply to text messages." *Hernandez v. Bedford Dental L.L.C.*, 2026 U.S. Dist. LEXIS 23208, at *3–4 (N.D. Ill. Feb. 4, 2026). There, as here, the defendant argued that the TCPA regulates only "calls," not texts. The court disagreed and refused to depart from longstanding precedent treating text messages as calls.

The *Hernandez* court further relied on the Supreme Court's clarification in *Loper Bright* that the decision did not "call into question prior cases that relied on the *Chevron* framework," and that "[t]he holdings of those cases that specific agency actions are lawful … are still subject to

---

[2] *Compare, e.g.*, *Davis*, 2025 WL 2491195, at *1 (relying on how "a normal person refers to a text message"), *with* 47 U.S.C. § 227(b)(1)(A)(iii) (using the word "call" to refer to a message sent to a "paging service," the most analogous type of communication in 1991).

statutory stare decisis." *Id.* at *3 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024)). Because the Supreme Court has repeatedly assumed that text messages qualify as "calls" under the TCPA, those holdings remain binding notwithstanding *Chevron's* demise. Notably, the *Hernandez* court also denied a request to stay proceedings pending the Seventh Circuit's review of *Jones*, concluding that the *Jones* defendant did not demonstrate a strong likelihood of success on the merits. *Id.* at *4. That assessment further confirms that *Jones* represents a minority position rather than controlling law.

Similarly, as explained above, it's irrelevant that Congress couldn't have text messages specifically in mind in 1991. "The mere fact that Congress did not envision the ubiquitousness of text messaging in 1991 does not mean the FCC's conclusion lacks support." *Skopos Fin.*, 2025 WL 2029274, at *4. *Jones* also disregarded the FCC's longstanding interpretation of "call" because the FCC, until 2023, had only articulated that interpretation in the context of the statute's autodialer prohibitions. 2025 WL 2042764, at *4–5. But that's unsurprising. The Do Not Call List provisions are built around the broadly defined term "telephone solicitation." 47 U.S.C. § 227(c)(1), (3). The standalone word "call" is more central to § 227(b)'s autodialer and robocall prohibitions, or in associated definitional provisions.[3] That's why the FCC first determined that "call" includes text messages in the § 227(b) context, and only more recently memorialized in a formal regulation that "call" has the same meaning in the Do Not Call List context. *See* 47 C.F.R. § 64.1200(e); 88 Fed. Reg. 20800, 20802 ¶ 6 (Apr. 7, 2023); 38 FCC Rcd. 12247, 12256–57 ¶ 26 (2023). Even after *Loper Bright* and *McLaughlin*, courts applying ordinary principles of statutory interpretation have reached the same conclusion: "Regardless of the level of deference afforded, the result is the same:

---

[3] *See* Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 3(a), 105 Stat. 2394, 2395–400 (using "call" or "calls" in the original text of 47 U.S.C. § 227(a)(1), (a)(3), (b)(1)(A), (b)(1)(B), (b)(2)(A), (b)(2)(B), (c)(1)(D), (c)(5), (d)(1)(A), (d)(3)).

a text message is a 'call' under the TCPA." *Mey v. Liberty Home Guard, LLC*, 2026 U.S. Dist. LEXIS 739, at *16 (N.D. W. Va. Jan. 5, 2026). But that doesn't mean there's any daylight between § 227(b) and § 227(c) on this question. And neither *Jones* nor Defendant identifies any reason why there would be. *See United States v. Paulson*, 68 F.4th 528, 555 (9th Cir. 2023) (absent cause to think otherwise, "a word or phrase is presumed to bear the same meaning throughout a text"). As the court in *Mey* further observed, "[t]here is no reason to assign the same word a different meaning in Section 227(c), given that both provisions protect the same core interest: the consumer's right to be free from unwanted intrusions." 2026 U.S. Dist. LEXIS 739, at *18.

But even putting aside this reasoning, it is incorrect to assert that the original public meaning of "telephone calls" extended only to voice-based communications when the statute was enacted in 1991. It did not. *Jones'* and *Davis'* premise, that text messaging via telephones did not exist in 1991, is false when one considers the universe of text-based telephone communications that existed in 1991, and, indeed, had existed for decades before. Both *Jones* and *Davis*, as well as the other two decisions cited by the Defendant, state that interpreting "telephone calls" to include text messages would amount to updating the statute to reflect technological changes. But it is just as clear that *Jones* and *Davis* abdicated their interpretative responsibility, not just in terms of a demonstrably wrong textual analysis, but also in ignoring the statutory framework and purposes of the TCPA. The TCPA's purpose was and is to protect consumers from unwanted telephone solicitations that invade their privacy and disrupt their daily lives. Unwanted text messages, particularly to individuals who are deaf and hard-of-hearing, are every bit as intrusive as unwanted voice calls, and perhaps more so, given the additional challenges implicit in living a life with hearing loss. To exclude text messages from the TCPA's protections based on a hyper-literal and historically ignorant reading of "telephone call" would thus defeat the TCPA's purpose. When

Congress enacted the TCPA in 1991, it did so with full knowledge that deaf individuals used text-based telephone communication via TTY/TDD devices, having *required* telephone companies to provide such devices and services a year prior. Congress chose to use the term "telephone call" rather than "voice call" or "spoken communication." This choice should be understood as inclusive of all forms of communication sent and received by telephones, including text-based telephone "calls."

Defendant's argument also fails because it isolates the phrase "telephone call" in § 227(c)(5) while ignoring the statutory structure that defines and governs the very conduct § 227(c) regulates. Section 227(c) is not a freestanding prohibition on "telephone calls." It is a regulatory scheme directed at "telephone solicitations." *See* 47 U.S.C. § 227(c)(1). Congress instructed the FCC to initiate rulemaking "concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations." *Id.* The FCC's Do Not Call regulations—whose violation § 227(c)(5) makes privately enforceable—implement that directive.

The key statutory definition appears in § 227(a)(4), which defines "telephone solicitation" as: "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services…" That definition is critical. As the Northern District of West Virginia recently explained in addressing this precise argument, § 227(a)(4) defines "telephone solicitation" as "the initiation of a telephone call or message," and "[b]y explicitly including 'messages,' Congress made clear that the statute's protections extend beyond traditional voice calls." *Mey v. Liberty Home Guard, LLC*, 2026 U.S. Dist. LEXIS 739, at *16–17 (N.D. W. Va. Jan. 5, 2026). Congress did not define "telephone solicitation" as merely "a telephone call." It defined it as "a telephone call or message." The disjunctive "or" demonstrates that Congress understood "message" to capture telephonic communications that might not fit

within the narrowest conception of a voice call. Section 227(c)(5), in turn, provides a private right of action to any person who has received more than one "telephone call" in violation of the regulations prescribed under § 227(c). Those regulations govern "telephone solicitations." Thus, § 227(c)(5) enforces violations of rules regulating conduct that is statutorily defined to include "telephone call[s] or message[s]."

Defendant's construction would fracture this structure. Under Defendant's theory, the FCC may regulate "telephone call[s] or message[s]" as telephone solicitations, but private enforcement would exist only if the solicitation happened to take the form of a voice call. That reading would produce an irrational asymmetry within the same subsection of the statute. Text messages are, by ordinary understanding, messages transmitted through telephones. They are telephonic communications sent to and received by telephone numbers over telephone networks. Congress's use of the term "message" in 1991 was broad and technology-neutral. Nothing in the statutory text limits "message" to prerecorded voice messages, and nothing in § 227(c) narrows the term.

Even if the statute left room to doubt that a text message can be an actionable violation of the Do Not Call List provisions (which it doesn't), the FCC's longstanding interpretation of the word "call" should still carry the day. As previously explained, the FCC is regulating here with discretionary authority expressly delegated by Congress. Acting under that express delegation, the FCC has reasonably explained that prohibiting texts to numbers on the Do Not Call List "make[s] … enforcement easier," "eliminate[s] any potential confusion in the industry," and aligns with both its determination that cell phone numbers are eligible for protection and the established meaning of the word "call" in other TCPA contexts.. Because the FCC acted reasonably and consistently in reaching that conclusion, this Court should affirm its "reasoned decisionmaking." *Loper Bright*, 603 U.S. at 395. Or, at a minimum, this court should look to the FCC's longstanding and consistent

interpretation of the word "call" as an "informed judgment to which [it can] properly resort for guidance." *Id.* at 388 (citing *Skidmore*, 323 U.S. at 139–40).

**II**. **Plaintiff states a claim under the OTSA.**

   **a.  This Court has jurisdiction under CAFA in addition to federal question jurisdiction.**

Although it is true that a district court will ordinarily dismiss supplemental state-law claims once all federal claims have been dismissed, *see* 28 U.S.C. § 1367(c)(3), this Court would almost certainly retain original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). Where CAFA jurisdiction exists, dismissal of federal claims does not divest the Court of subject-matter jurisdiction over the action. The Court should therefore either grant leave to amend to make CAFA jurisdiction explicit or permit the case to proceed without requiring formal amendment.

   **b.  Plaintiff need not allege a violation under a specific subsection of OTSA.**

Under federal notice-pleading standards, a complaint need not cite a specific statutory subsection to state a viable claim. Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," and detailed statutory element pleading is not required at the outset. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (holding that a complaint need not spell out the precise legal elements to survive a motion to dismiss so long as it provides fair notice of the claim).

   **c.  Plaintiff has plausibly alleged the use of an automated system for the selection or dialing of phone numbers.**

Orthotech argues that Plaintiff has failed to state an OTSA claim because she has not identified the brand name or vendor platform Orthotech used to send the text messages. But that argument demands information that is uniquely within Orthotech's possession. And courts in the similar context of the TCPA have repeatedly rejected the premise that a plaintiff must plead technical specifics about dialing equipment at the motion-to-dismiss stage.

As the court explained in *Izsak v. DraftKings, Inc.*, while a TCPA plaintiff should not be expected to plead details regarding the technical functionality of the alleged ATDS, the complaint must include at least some facts supporting the conclusion that automated technology was used, such as the promotional or generic nature of the message, or allegations that identical messages were sent to many potential customers at the same time. 191 F. Supp. 3d 900, 904 (N.D. Ill. 2016). The same principle applies here. The OTSA likewise targets mass telemarketing conducted through automated dialing systems, and plaintiffs cannot be expected to know the precise platform used before discovery. Plaintiff has alleged sufficient facts to make automation plausible. Plaintiff alleges Orthotech routinely violates the TCPA and OTSA by delivering, or causing to be delivered, multiple marketing text messages to numbers listed on the National Do-Not-Call Registry. Compl. ¶ 2. Plaintiff alleges Orthotech sent at least three unsolicited generic marketing texts to her number, despite her registration on the registry and lack of consent. Compl. ¶¶ 17–21. The messages advertised Orthotech's orthodontic services and were promotional in nature. *Id*. The standardized marketing content of those texts further supports the inference that they were generated and disseminated through an automated platform rather than composed individually. Plaintiff further alleges that these texts were sent *en* masse. Compl. ¶27. These allegations describe systematic, campaign-based outreach—not isolated, manually sent communications. Taken together, they suggest the use of an automated system. It is implausible that such conduct was carried out through manual, individualized texting.

Courts have held that comparable indicia of automation are sufficient at the pleading stage in TCPA cases. For example, in *Whitehead v. Ocwen Loan Servicing, LLC*, the court found allegations sufficient where the plaintiff alleged autodialing based on the volume of calls received and the pause before a voice came on the line. No. 2:18-cv-470-FtM-99MRM, 2018 U.S. Dist.

LEXIS 182386, at *11 (M.D. Fla. Oct. 24, 2018). And in *Zeidel v. National Gas & Electric, LLC*, the court explained that generic promotional communications can constitute facts supporting a reasonable inference that the defendant used an ATDS. No. 18 CV 06792, 2019 U.S. Dist. LEXIS 83988, at *6 (N.D. Ill. May 17, 2019). Plaintiff's allegations here serve the same function: they describe a standardized marketing campaign directed at a large pool of recipients, which plausibly implies automated selection and transmission.

Finally, Orthotech's argument ignores the practical reality of pleading. At this stage, Plaintiff has no access to Orthotech's internal systems or vendor contracts. Courts therefore do not require plaintiffs to plead technical details about dialing equipment that they have no way of knowing before discovery. *Shelton v. National Gas & Electric, LLC*, No. 17-4063, 2019 U.S. Dist. LEXIS 59235, at *32–34 (E.D. Pa. Apr. 5, 2019). The same logic applies here. Plaintiff has alleged enough facts to make the use of an automated system plausible, and Orthotech's contrary argument is simply a demand for evidentiary detail that Rule 8 does not require.

### d.  Plaintiff has alleged that she is aggrieved and has actual damages, but she does not need to allege actual damages.

The text and structure of the OTSA demonstrate that Plaintiff need not allege actual damages. The remedies provision of the OTSA (§ 775C.6(A)) provides that:

A party who is aggrieved by a violation of this act may bring an action to:

1. Enjoin such violation; and
2. Recover actual damages or Five Hundred Dollars ($500) whichever is greater.

Defendant argues that because "Plaintiff does not request, and clearly did not suffer, actual damages" (she did), Plaintiff "fails to state a claim for a violation of the OTSA." ECF 22 at 19. However, the Solicitations Act as the above text shows, allows for the recovery of both "actual"

<u>or</u> statutory damages. To hold otherwise this Court would have to effectively rewrite the statute as follows:

> A party who is aggrieved by a violation of this act may bring an action to:
>
> 1. Enjoin such violation; and
> 2. Recover actual damages ~~or Five Hundred Dollars ($500) which ever is greater.~~

The Legislature thus created an express statutory damages alternative. It did not condition recovery on proof of economic loss. To the contrary, it provided that a prevailing plaintiff may recover actual damages **or** $500—whichever is greater. Defendant's reading would effectively erase that statutory option. If "aggrieved" meant "economically harmed," then a plaintiff who suffered no quantifiable financial loss could never recover the $500 statutory amount. The Legislature's express inclusion of statutory damages would become surplusage. The Legislature plainly anticipated that many telephonic solicitation violations would cause real, but non-economic, harms—such as invasion of privacy and nuisance-type disruption. Statutory damages provide a remedy precisely because such harms are difficult to monetize.

Because Oklahoma standing doctrine tracks federal standing doctrine (*Campbell v. White*, 1993 OK 89, ¶ 16 n.25)—and because the OTSA's damages provision tracks the TCPA—the relevant framework is the Article III injury-in-fact test articulated in *Lujan v. Defenders of Wildlife*, which requires a concrete and particularized injury that is actual or imminent. 504 U.S. 555, 560 (1992). Under that standard, unwanted telemarketing texts qualify as a concrete injury because they intrude on the recipient's privacy and disrupt domestic peace. *See LaVigne v. First Cmty. Bancshares, Inc.,* 215 F. Supp. 3d 1138, 1146 (D. NM.) ("The list goes on, with each finding that the bare statutory violation of the TCPA constitutes sufficient 'concrete' injury for Article III standing. *See Hewlett v. Consol. World Travel, Inc.*, 2016 U.S. Dist. LEXIS 112553, 2016 WL

4466536, at *2 (E.D. Cal. Aug. 23, 2016) (noting that courts 'have consistently held that allegations of nuisance and invasion of privacy in TCPA actions are sufficient to state a concrete injury under Article III' where defendant used ATDS to call plaintiff without her consent in an attempt to sell her a free cruise) (citing cases); *Ung v. Universal Acceptance Corporation*, 198 F. Supp. 3d 1036, 2016 U.S. Dist. LEXIS 102363, 2016 WL 4132244, at *2 (D.Minn., 2016) ('Cases . . . have repeatedly recognized that the receipt of unwanted phone calls constitutes a concrete injury sufficient to create standing under the TCPA'). Indeed, in interpreting the TCPA, federal courts have routinely found that receipt of a single unwanted telemarketing call or text is enough to give a consumer standing to sue under the TCPA. *See*, e.g., *Drazen v. Pinto*, 74 F.4th 1336, 1345 (11th Cir. 2023); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017); *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351-52 (3d Cir. 2017); *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 990 (9th Cir. 2023) (allegations that plaintiff "found Defendants' texts to be 'irritating, exploitative and invasive'" were "not necessary to show injury in fact" but indicated that she "suffered the precise sort of nuisance and privacy deprivation the TCPA was enacted to address"). Here, however, Plaintiff does allege harm in that "she suffered an invasion of privacy, an intrusion into her life, and a private nuisance." Compl. ¶22.

Defendant attempts to convert "aggrieved" into a heightened standing requirement requiring economic loss. But nothing in the OTSA's text supports that limitation. The statute does not say "financially aggrieved." It does not say "economically injured." It says "aggrieved by a violation." But nothing in the OTSA's text supports that limitation. It does not say "economically injured." It says "aggrieved by a violation." If the Legislature had intended to require proof of monetary damages, it knew how to say so. Other Oklahoma statutes explicitly condition recovery

on "actual damages sustained." The OTSA does not. Instead, it provides for actual damages or a fixed statutory sum.

Moreover, even if the harm from a single unsolicited text might be viewed as modest, the Oklahoma Legislature has authority to recognize and remedy intangible harms that are real but would otherwise be difficult to monetize. Even so, the Oklahoma Legislature has expressly recognized and endorsed nominal damages even if "a breach of duty has caused no appreciable detriment to the party affected. . . ." 23 O.S §98.  Nominal damages are not only available, but they are certifiable. *See*, *e.g.*, *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1015 (5th Cir. 2003); *Quainoo v. City of Huntsville, Ala.*, 611 F. App'x 953, 955 (11th Cir. 2015) (defining nominal damages as up to $100); *Trevino v. Southwestern Bell Tel. Co.,* 582 S.W.2d 582, 585 (Tex. App. 1979) (nominal damages in the amount of $50 for invasion of privacy); *Cummings v. Connell*, 402 F.3d 936, 944-45 (9th Cir. 2005) (where "every member of the class suffered the same deprivation of rights . . . every member is entitled to nominal damages, just as if each one had brought his or her own lawsuit"). Whether viewed from the lens of actual damages, statutory damages, or nominal damages, there can be no real dispute that damages are alleged and allowable – the only question is the amount of such damages, a question appropriate for a later day.

*Orthotech* relies on *Walls v. American Tobacco Co.*, 2000 OK 66, to argue that receiving unwanted telemarketing text messages is insufficient to render a consumer "aggrieved," attaching to the mere invocation of the word aggrieved some kind of heightened standing requirement. ECF 22 at 17–19. *Orthotech* is wrong. *Walls* interpreted a different statute—the Oklahoma Consumer Protection Act—and turned on statutory language that is materially different from the OTSA. In holding that a plaintiff must suffer "actual damages" to recover under the Consumer Protection Act, the Oklahoma Supreme Court emphasized that decisions interpreting other states' consumer-

protection statutes were not helpful because those statutes contained "very different language." *Walls*, 2000 OK 66, ¶ 12. Thus, the court limited its holding to the Consumer Protection Act's specific statutory language; it was not announcing a generalized, heightened standing rule applicable across Oklahoma statutes that use the word aggrieved. Like those out-of-state consumer protections statutes, the Solicitations Act contains "very different language" from the Consumer Protections Act. The Consumer Protection Act provides:

> The commission of any act or practice declared to be a violation of the Consumer Protection Act shall render the violator liable to the aggrieved consumer for the payment of actual damages sustained by the customer and costs of litigation including reasonable attorney's fees, and the aggrieved consumer shall have a private right of action for damages.

Okla. Stat. tit. 15, § 761.1(A); compare 15 Okl. Stat. § 775C.6 (authorizing recovery of "actual damages or Five Hundred Dollars ($500) which ever is greater"). For that reason, *Walls* does not control here. Applying *Walls* to the OTSA would effectively rewrite it by treating the Legislature's express statutory-damages remedy as surplusage. Defendant's argument stretches *Walls*. *Walls* holds only that an "aggrieved" plaintiff must suffer some "detriment or loss" caused by the statutory violation. 2000 OK 66, ¶¶ 11–13, 11 P.3d at 629–30. It does not hold that the detriment must be monetary. That is why the *Walls* plaintiffs lacked a claim: they "received precisely what they had bargained for" and therefore suffered no injury from the alleged statutory violation. *Id*. ¶ 10. Here, Plaintiff alleges the violation itself caused a concrete intrusion—an invasion of privacy and nuisance-type disruption from unwanted text messages. Those allegations satisfy *Walls*'s requirement of detriment causally tied to the violation. Defendant's position would effectively rewrite "aggrieved" to mean "financially harmed," but *Walls* uses broader language: "detriment or loss." *Id*. ¶ 13. At the pleading stage, Plaintiff has alleged enough to qualify as an "aggrieved" called party under the OTSA. Even if Plaintiff were required to plead actual damages, she has done

so. *Walls* involved cigarette purchasers who alleged no concrete injury from buying cigarettes. Some class members may never have smoked a single cigarette, suffered illness, or experienced any harm at all. *Walls v. Am. Tobacco Co.*, 2000 OK 66, ¶ 13, 11 P.3d 626, 630. For example, a person who bought a pack of cigarettes once as favor to a neighbor would be part of the putative *Walls* class; a person who suffered no harm whatsoever. Here, by contrast, Ms. Ferrell alleges an invasion of privacy, an intrusion into her life, and a private nuisance. Compl. ¶ 22. Those allegations describe a real injury, albeit a non-economic one. And unlike the speculative harm asserted in *Walls*, Ms. Ferrell alleges precisely the kind of annoyance and intrusion the OTSA was enacted to prevent, on behalf of a class of similarly situated consumers.

Defendant likewise relies on *Seale v. Peacock*, but that reliance is also misplaced and for the same reason: *Seale v. Peacock* construed materially different statutory language: the damages provision of the Stored Communications Act. 32 F.4th 1011, 1022 (10th Cir. 2022):

> The court may assess as damages . . . the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, but in no case shall **a person entitled to recover** receive less than the sum of $1,000.

18 U.S.C. § 2701(a) (emphasis supplied). The *Seale* Court placed significant weight on the above-bolded words which limit statutory damages to a person otherwise "entitled to recover" holding that statutory damages were only available to persons entitled to recover actual damages and analogizing the Stored Communications Act to the Privacy Act, which contains materially similar language. *Seale*, 32 F.4th 1011, 1023 (10th Cir. 2022). Thus, the relevant language for the *Seale* Court was not the use of the word "aggrieved" but the phrase "a person entitled to recover." Nor could an interpretation of a federal statute establish that the word aggrieved is some sort of specialized term of art under Oklahoma law as Defendant seems to suggest. ECF 22 at 19. Notably,

both the TCPA and the OTSA do not track the language of the Stored Communications Act. Compare 47 U.S.C. § 227(c)(5) and 15 Okl. St. § 775C.6 with 18 U.S.C. §2701(a).

There is no special magic in the word aggrieved that automatically ratchets up the amount of harm required. For example, The Oklahoma Fair Housing Act defines an aggrieved person as a person who "claims to have been injured by a discriminatory housing practice; or believes that he or she will be injured by a discriminatory housing practice." 25 Ok. St. § 1451. Notably this definition does not require something more than standing under the Oklahoma Constitution. Thus what matters is not the invocation of a magic word, but the complete statutory langue. Statutory interpretation "depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedent or authorities that inform the analysis." *United States v. Figueroa-Labrada*, 780 F.3d 1294, 1298 (10th Cir. 2015) (quoting *United States v. Ko*, 739 F.3d 558, 560 (10th Cir. 2014). What Orthotech ignores is the material difference between the statutes it relies on and the OTSA. The Oklahoma Consumer Protection Act and the Stored Communications Act expressly condition a private right of action on proof of "actual damages." *Walls*, 2000 OK 66, ¶¶ 9–13; *Seale*, 32 F.4th at 1027. The OTSA does not. Like the TCPA, the OTSA creates liability if there is the equivalent of Article III standing (as noted above the standing analysis under Oklahoma and Federal law are identical). Reading "aggrieved" to require something more than regular standing would improperly import limiting language that the Oklahoma legislature did not choose to include.

Defendant's interpretation would collapse the statute into a contradiction: plaintiffs must prove actual damages in order to recover statutory damages that exist precisely because actual damages are often nominal or difficult to prove. That is not a plausible reading of the statute. Accordingly, the Court should reject Defendant's attempt to graft an economic-harm requirement

onto the OTSA and hold that receipt of unlawful telemarketing texts—constituting an invasion of privacy and nuisance—is sufficient to render Plaintiff "aggrieved" under the statute.

## CONCLUSION

For the foregoing reasons, Defendant's motion should be denied in its entirety.

| Dated: February 12, 2026 | Respectfully Submitted: |
|---|---|
|  | */s Anthony I. Paronich*<br>Paronich Law, P.C.<br>350 Lincoln Street, Suite 2400<br>Hingham, MA 02043<br>[o] (617) 485-0018<br>[c] (508) 221-1510<br>[f] (508) 318-8100 |